1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - -X
3    UNITED STATES OF AMERICA,      : 20-CR-306(NGG)
                                     :
4           Plaintiff,              :
                                     : United States Courthouse
5       -against-                   : Brooklyn, New York
                                     :
6    FRANGESCO RUSSO,               :
                                     : Wednesday, August 19, 2020
7           Defendant.              : 2:30 p.m.
     - - - - - - - - - - - - - - - -X
8

9


10          TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPEAL
         BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
11              UNITED STATES DISTRICT JUDGE

12

13                  A P P E A R A N C E S:

14   For the Government:        SETH D. DuCHARME, ESQ.
                                Acting United States Attorney
15                              Eastern District of New York
                                271 Cadman Plaza East
16                              Brooklyn, New York 11201
                                BY:  LINDSAY K. GERDES, ESQ.
17                                   Assistant United States Attorney

18   For the Defendant:         LARUSSO, CONWAY & BARTLING, LLP
                                300 Old County Road
19                              Suite 341
                                Mineola, New York 11501
20                              BY:  JOSEPH CONWAY, ESQ.

21

22   Court Reporter:            DAVID R. ROY, RPR
                                225 Cadman Plaza East
23                              Brooklyn, New York 11201
                                drroyofcr@gmail.com
24

25   Proceedings recorded by Stenographic machine shorthand,
     transcript produced by Computer-Assisted Transcription.

Proceedings                                        2

1        (All participants appearing via teleconference.)

2        THE COURTROOM DEPUTY:  This is criminal cause for

3   a bail appeal, United States versus Russo.

4        Starting with the Government, please state your

5   appearances for the record.

6        MS. GERDES:  Good afternoon, Your Honor.  Lindsay

7   Gerdes for the United States.

8        THE COURT:  All right.

9        For the defense?

10        MR. CONWAY:  Good afternoon, Your Honor.  It's Joe

11   Conway on behalf of Frank Russo.

12        THE COURT:  Good afternoon, sir.

13        MR. CONWAY:  Good afternoon.

14        MS. GERARDINO:  Good afternoon, Your Honor.  It's

15   Marnie Gerardino with Pretrial Services.

16        THE COURT:  Yes, good afternoon.

17        And is the defendant present?

18        THE DEFENDANT:  Yes, I am, sir.

19        THE COURT:  All right.

20        First of all, under the local Rule Number 1.8 of

21   this court and the policies of the U.S. Judicial Conference,

22   no one may record this proceeding.  Failure to follow that

23   requirement may result in sanctions.

24        The first step to take on this bail appeal is to

25   ascertain whether there is Defendant's consent to this

```
                          Proceedings                      3
```

 1   proceeding being conducted by teleconference under the

 2   CARES Act and administrative order of the chief judge of

 3   this court which permits conducting this bail appeal

 4   remotely with your consent.

 5           Mr. Russo, do you consent?

 6           THE DEFENDANT:  Absolutely, Your Honor.

 7           THE COURT:  All right.  Thank you very much.

 8           Now, the magistrate judge, Judge Bloom, granted

 9   the application for bail.  The Court has reviewed the

10   following materials:  There is a letter from the Government

11   seeking a permanent order of detention, dated August 18,

12   2020 that the Court has reviewed.  The Court has reviewed

13   the indictment in this case, Docket Number 20-CR-306.

14   The Court has reviewed the transcript of the proceeding

15   below and also the report of the Pretrial Services Officer,

16   and the Court thanks the Pretrial Services Officer for the

17   report.

18           So at this time, the appeal is by the Government

19   and I will have the Government make its statement.

20           Ms. Gerdes?

21           MS. GERDES:  Thank you, Your Honor.

22           You know, as the Court knows, the Government does

23   not seek detention for every defendant in every case and not

24   even in every serious case, and we didn't do it here.  We

25   took a very measured approach about our bail recommendation,

Proceedings                                          4

1    and we are appealing Judge Bloom's decision because we do

2    feel strongly about the danger posed by the defendant here.

3    Frank Russo is charged with stealing millions of dollars

4    from unsuspecting victims and leading a lavish lifestyle

5    from that fraud and from extortion; and what I would say is

6    it's very unusual that wealthy fraudsters are also charged

7    with violent crimes like the defendant.  And it's even more

8    unusual to have a case against a defendant that can

9    essentially be proven by hitting play on a recording and

10   listening to his own voice.  So this the somebody who is

11   facing a serious amount of jail time where there's

12   tremendous evidence against him.  And so he does have an

13   incentive to flee.

14           But it's not just the risk of flight that concerns

15   us, because if that was the only appeal, frankly, I don't

16   think we would have appealed the judge's decision.  We

17   agreed on a very substantial bail package in the situation

18   of other Co-Defendants here.  But what brings us here is the

19   danger the defendant poses, and Defendants who are charged

20   with extortion and make threats no doubt pose a danger, but

21   in this situation with Mr. Russo, the threats are just so

22   menacing, explicit, and frankly, terrifying.  He told an

23   individual that they were going to make him watch as they

24   ripped his son's teeth out, and that they were going to do

25   worse things to his wife.  And Judge Bloom resting her

1    decision in part on a distinction that -- you know, that the

2    teeth-pulling from the son done by somebody else just made

3    Russo not quite as menacing because he wasn't the one doing

4    the teeth-pulling himself.  And with all due respect,

5    Your Honor, I don't think that's a reasonable view of a

6    threat like this.  I don't think any rational person reading

7    these threats, hearing that would be left feeling anything

8    other than terrified.

9            And I don't think Defense Counsel's argument that

10   the threat was to a fraudster, therefore it makes it okay

11   was very persuasive either, because as we state in our

12   detention memo, and I believe it's on the bottom of Page 31,

13   he also threatened another individual, and --

14           THE COURT:  Mr. Alfieri?

15           MS. GERDES:  Yes.  He threatened Mr. Alfieri and

16   he also threatened another person involved in a business

17   dispute.

18           And what you have here, then, is a person making

19   these very, very explicit threats.  You also have somebody

20   here who under his bed has this gun that we put a -- a

21   shotgun that we put a picture of in our detention memo that

22   is essentially a weapon of war, and he also had ammunition

23   at his house that was recovered during the search.  So some

24   of this -- these are not just empty threats.  Your Honor,

25   Mr. Russo is somebody who just simply cannot be trusted.  He

Proceedings                                          6

1    is a danger and he shouldn't be trusted by this Court to

2    abide by the conditions of Pretrial release.

3           One way that can be demonstrated is the man wasn't

4    even honest with Pretrial Services in his interview leading

5    up to his first appearance before Judge Bloom.  He said that

6    his wife was the one who bought the Motts Cove home that

7    they were set to move into later this month.  That was a

8    home they purchased for about $1.5 million.  The truth is

9    that the defendant is the one who supplied all of the money

10   to purchase that home, and the home is in the name of both

11   him and his wife.  So he's obviously trying to distance

12   himself from that asset by saying that his wife purchased

13   this home, but that can't be anything further from the

14   truth.

15          He also regarded an --

16          THE COURT:  And --

17          MS. GERDES:  I'm sorry.

18          THE COURT:  Can I just ask, was that home

19   purchased with cash, meaning without a mortgage; or was that

20   purchased with a down payment and a mortgage?

21          MS. GERDES:  It was purchased without a mortgage,

22   Your Honor.  And I believe that he invested, you know,

23   between improvements for the home and things he was

24   purchasing for the home and design, and I think by his own

25   admission, he invested over a million dollars, then, on top

1  of that.

2        THE COURT:  The report from Pretrial doesn't

3  indicate a large amount of assets on the part of this

4  defendant.  Is that --

5        MS. GERDES:  Correct.  That was another misleading

6  statement I was going to also point out.  When he listed

7  assets, he only listed $15,000 in a checking account.  He

8  omitted the house, that with these improvements, is valued

9  at two and a half million dollars plus.  He omitted a house

10  in Florida that is on the market right now for $1.5 million

11  that he co-owns with his Co-Defendant, Smookler.  He omitted

12  a house in St. John that he co-owns.  He omitted two boats.

13  He omitted the business account that he uses as his own

14  personal slush fund to pay his expenses that as of last

15  Friday had an account balance of $185,000.  He omitted the

16  $85,000 in cash that was recovered from his residence upon

17  his arrest.  And, you know, frankly, Your Honor, I just do

18  not think this is a person that the Court should go out on a

19  limb for when he can't even give honest, truthful answers to

20  the Pretrial Services Agency, the agency that would be

21  tasked with supervising him upon his release, and, you know,

22  with the type of threats that he has made.

23        And so we do think that Judge Bloom, you know, got

24  the bail determination wrong here, and that is why we are

25  before Your Honor.  We don't think that there is a

Proceedings                                  8

1    combination of conditions that can protect the public and

2    also keep the defendant here for future court appearances.

3              THE COURT:  Well, let me just pursue that for a

4    moment.  In your detention memorandum of August 18th, you

5    indicated that you were seeking detention for both Mr. Russo

6    and Mr. Smookler, but you accepted the magistrate judge's

7    determination that Mr. Smookler could be released and did

8    not appeal that.  So how do these two different individuals

9    who you were seeking detention, if only you were seeking

10   detention, how are they different from one another in a

11   meaningful way that would inform the Court's understanding

12   of why you are appealing from the magistrate judge's

13   determination about Mr. Russo but not about Mr. Smookler?

14             MS. GERDES:  Your Honor, we ultimately agreed on

15   the bail package for Mr. Smookler.  So we were not in a

16   situation where we were appealing or considering an appeal

17   for him.  The one contested bail package yesterday was

18   Mr. Russo's bail package, and we do just think that the

19   threats that he has been caught on recordings making just

20   show that he is that much more of the danger.  Our primary

21   concern with Mr. Smookler was more the risk of flight,

22   whereas with Mr. Russo, based on all the threats that we

23   have outlined in our detention memo, the real concern with

24   him is the danger that he poses.

25             THE COURT:  I see.

```
                           Proceedings                    9
```

 1          And the weapon which was shown on Page 31 of your

 2   detention memorandum letter, that was found in Mr. Russo's

 3   home?

 4          MS. GERDES:  Correct.

 5          THE COURT:  And tell me what that is again.  Is

 6   that the -- do you believe that's the tactical shotgun that

 7   you have quoted as referring to that he would use, quote,

 8   "If anything gets crazy..." end quote?  Is that the one that

 9   you believe he's referring to?

10          MS. GERDES:  Yes, Your Honor.  I do believe that.

11   I think that that's accurate.

12          And, you know, he's also basically just flaunting

13   his complete disrespect for the law at different points in

14   time.  You know, telling people, they can call the police.

15   They can call the FBI, that basically, you know, he's above

16   the law in essence.  And I don't think that this is somebody

17   who should be trusted.  He said, "Before the law can even

18   arrest me, I'll have everyone with a fucking bullet in the

19   head."

20          THE COURT:  Okay.  Thank you.

21          MS. GERDES:  Thank you.

22          THE COURT:  Mr. Conway?

23          MR. CONWAY:  Yes, thank you, Your Honor.

24          Let me start with the premise that the Court may

25   not be aware of this:  The bail that we put forward in front

1   of Judge Bloom yesterday was three properties that totalled

2   1.5 or 1.6 in equity, and that's the package that

3   Judge Bloom agreed to -- or at that point agreed to.  Since

4   that time, and I have made Ms. Gerdes aware of this, we have

5   two additional properties from a family member and a

6   longtime friend that brings the package up to 2.5 million in

7   equity.  So Judge Bloom had set bail at 2 million secured by

8   the three properties.  We now have 2.5 million.  I think

9   that's important in this respect, Judge:  Obviously, it's

10  five properties as opposed to three.  But it's the same

11  exact package that the Government consented on

12  Mr. Smookler's bail.  And I think that's important for a

13  couple reasons, Judge, and I'll get into that and then I'll

14  get into the threats themselves.

15          As the Court said in answer to the U.S. Attorney,

16  yesterday's bail memorandum, they sought detention -- "they"

17  being the Government, sought detention on both grounds for

18  both Smookler and Russo.  In terms of the threats, what we

19  have here, Judge, I know the Government mentioned a second

20  person, and I'm not poo-pooing that, and I'll get to that,

21  but the person that was threatened was an individual as the

22  Court said named Greg Alfieri.  He was somebody who has been

23  threatened by numerous people.  He's currently under

24  indictment in your courthouse for running a Ponzi scheme in

25  excess of $100 million.  A good chunk of that money comes

Proceedings                    11

1    from the defendants in this case.  So obviously they were

2    pissed or mad at him, and the telephone calls, even though

3    they're colorful and ugly, were nothing more than puffery

4    and blustering.  And I've had a difficult time trying to

5    square the Government's position on Fran Smookler and their

6    position on Frank Russo when you look at the threats.

7    Because if you look at their detention memo and if you go to

8    Page 22 and Page 23, they've linked Smookler and Russo

9    together.  They join them at the hip.  On Page 22 of the

10   bail memo, they write, "Smookler and Russo vowed to shoot

11   Alfieri...,"  and there's a whole series of recorded calls.

12   There's Smookler and Russo.  Smookler says, "The originators

13   on the loan are crazy people and animals."

14           On Page 23 there's a reference that Smookler and

15   Russo, again together, threatened Alfieri and his family.

16   On Page 23 in Paragraph 22 they quote Smookler in a phone

17   call basically saying, "You watch, my man.  You fucked me.

18   Now watch what I am going to do to you.  I'm coming,

19   brother, full F'ing steam ahead."  He goes on to say,

20   "People in the street are going to inflict harm on you for

21   causing me suffering."

22           Later in that page, Judge, on a phone call that's

23   3/21 of '20, Smookler says to Alfieri, "Your wife will pay

24   for your mistakes."  A little later he says, "I don't give

25   an 'F'.  I don't care.  You're going to get tortured."

Proceedings                                          12

1    Lastly in that call, he says, "We are going to find your

2    wife today.  That's happening."

3             On a 5/5/20 call, May 5th, 2020, Smookler again

4    says, "I'm not going away.  Big problem.  I'm going to turn

5    ungentlemanly and I will 'F' you and your family up."

6             So I'm not making the argument, Judge, that -- you

7    know, that the calls are acceptable.  They're certainly not.

8    But they certainly join both Smookler and Russo together at

9    the hip.  In fact, in one phone call in which Russo is

10   making some ugly, ugly threats, Smookler joins in and says,

11   "What are you going to do?  Are you going to go down in a

12   blaze of glory?"

13            I don't understand why Smookler is different when

14   I have the same exact bail package?

15            As to the threats themselves, Judge, and I'll go

16   back.  I know they emphasize Mr. Russo had a weapon.  They

17   took a weapon out of Mr. Smookler's home yesterday during

18   the search as well.

19            They do mentioned a separate individual --

20            THE COURT:  Let me just ask -- excuse me.  Let me

21   just turn to the Government.

22            What type of weapon was taken from Mr. Smookler's

23   home, Ms. Gerdes?

24            MS. GERDES:  Your Honor, it was a shotgun, but I

25   just do not believe that it was the same type of tactical

1    shotgun as Mr. Russo had.

2            THE COURT:  I understand.

3            I'm sorry, Mr. Conway.  You may continue, sir.

4            MR. CONWAY:  Thank you, Your Honor.

5            And, Judge, I did mention that there's a second

6    threat.  We have a 34-page memo that details in great detail

7    a lot of things, and there's five lines about a potential

8    second threat.  There's no date.  There's no time.  There's

9    no individual name as to when, where, and who this happened

10   to.

11           In terms of the threats themselves, Your Honor,

12   while I don't condone them, you can see by the very nature

13   of the threats that although colorful, it was nothing more

14   than bolstering and puffery.  These individuals -- and I

15   mean Smookler and Russo as well as the other defendant,

16   Kurland -- and, you know, the Government did consent on

17   Kurland as well, and in the detention memo they said that

18   Kurland was aware of these threats, but they contented to

19   his bail package as well.  These threats, Judge, take

20   place --

21           THE COURT:  And did they find a shotgun in his

22   house, too?

23           MR. CONWAY:  No, Your Honor.

24           THE COURT:  All right.  Well, okay.  So, you know,

25   he --

```
                     Proceedings                    14
```

1              MR. CONWAY:  Right.

2              THE COURT:  Let me --

3              MR. CONWAY:  I'm just weighing in context as to

4    what they're agreeing to and what they're not.

5              So in these threats, Judge --

6              THE COURT:  Yeah.

7              MR. CONWAY:  -- these threats happened between

8    March and May of this year.  If the Government is so

9    egreged -- or they're so outraged by the threats, why did

10   they wait three months to make any arrests?  There's nothing

11   happening since May 20th.  There were wiretaps in this case,

12   there was nothing here past May 20th showing any threats

13   whatsoever.  Alfieri was on the street.  He was not arrested

14   until the 10th of July, and that's because, Judge, these

15   threats were nothing more than trying to get their money

16   back that Alfieri had taken from them.  These threats were

17   colorful.  They were boisterous, but they were nothing more

18   than puffery.

19             Alfieri's indicted now.  I think he may or may not

20   be a Government witness.  The factors that Judge Bloom put

21   together for a bail package such as house arrest and

22   electronic monitoring and all the other conditions, there is

23   no danger here that Frank Russo is to anybody in this

24   particular case at all at this time.  Given that there is a

25   bail package of five separate properties from family members

Proceedings                                    15

1   and somebody who has known Frank for almost his entire life,
2   that's worth 2.5 million, in addition to the home and the
3   Florida home that they've seized, that's in excess of over
4   $5 million.
5            I will say a couple things, Judge, as to what the
6   Government's mentioned in the Pretrial report.  First off,
7   the house on Roslyn was purchased way back in, I believe,
8   October or November of last year.  They haven't been able to
9   move in because of COVID.  The house is in a trust.  It's in
10  both their names, him and his wife's, and his wife is the
11  trustee of the trust.  So in essence, she does own the house
12  technically, but it is his house as well.
13           As far as the Florida house goes, Judge, that
14  house has sold.  In fact, there's a closing due on Friday.
15  So for all practical purposes, he doesn't own that house
16  anymore, so I don't think he omitted that to Pretrial at
17  all.
18           Frank Russo, Your Honor, is 38 years old.  He's a
19  lifelong resident of New York.  He has a wife for 11 years.
20  They've been together since they were 12 years old, so
21  they've been together 25, 26 years.  They have two children.
22  Frank has no prior record.  He's been gainfully employed his
23  whole life.  He has a mother here and a brother here.
24  That's all he has.  His wife has a couple of family members.
25  If he was to get out and flee or violate bail, he would be

1   leaving his mother-in-law, his wife, his brother, and one of

2   his best friends in life practically homeless.  I don't

3   think he's a risk of flight at all.

4        There's no mandatory minimum in this case.  In the

5   Government's memorandum, they put in a guideline range which

6   obviously is high, but -- I believe it's 97 to 100 and -- or

7   108 to 135 months, but that's certainly nothing to what

8   we're used to in seeing 240 months, 360 months or a

9   mandatory minimum of 10 to 20 years.  So I don't believe

10  he's a flight risk as well.

11       All three other defendants were released.  I don't

12  think Mr. Russo is any different than Mr. Smookler.

13       And lastly, Judge, in all likelihood this case is

14  going to be declared a complex case, which means it will be

15  quite some time before this case comes up for trial.  We are

16  in the middle of a pandemic now in terms of sending somebody

17  to the MDC where there are no visitation rights at this

18  point.  When they come back is anybody's guess.  It would be

19  almost impossible to have him participate in any meaningful

20  way in his defense.  And he obviously would be cut off from

21  family and friends because there is no visitation at this

22  point, and I think in the foreseeable future.

23       So based on all those factors, Your Honor, I think

24  the conditions set forth by Magistrate Bloom, which are

25  conditions that the Pretrial Services Officer in her report

Proceedings                               17

1   put in there recommending a substantial secure bond, that we

2   do have a substantial secure bond.  We can make the bond

3   whatever face amount the Court deems relevant, 2 million,

4   3 million, 4 million secured by five pieces of property

5   totalling 2.5 million is certainly adequate at this point

6   along with the conditions to keep Mr. Russo in check.

7              MS. GERDES:  Your Honor, may I briefly respond?

8              THE COURT:  Yes, you may.

9              MS. GERDES:  Thank you.

10             On Page 31 we have always acknowledged that Russo

11   presents a greater danger than Smookler.  We have not seen

12   the two of them similarly situated in that regard.  And that

13   was capitalized by the fact that the very gun that he

14   threatened to use against an individual is the very gun that

15   we recovered under his bed, a gun with a laser sight, a

16   pistol grip, and a bump stock, a weapon that could kill

17   someone; and he had ammunition in his house that could end

18   someone's life.  His threats were much, much more explicit.

19   I can proffer to the Court that the threats to the other

20   individual referenced at the bottom of Page 31 were made on

21   July 29, so less than a month ago.  And, you know, with him

22   out on release and no longer on the wiretap, we cannot

23   monitor him.  And we did have to take protective measures

24   out of fear for what could happen to one of the defendant in

25   this case.

1          This distinction for what he's trying to make as

2     to why he hid his assets from Pretrial is not one that I

3     appreciate or I find persuasive at all.  Even though this

4     house in Florida was set to be sold, that means he would

5     have been coming in to half of $1.5 million.  That's quite

6     an asset, I would say.  Mr. Smookler didn't have any trouble

7     disclosing that asset to Pretrial, nor did he have any

8     trouble disclosing the house in St. John, and he declared

9     his net worth to be at approximately $3.8 million.  So these

10    two people are just not similarly situated at all in terms

11    of the danger they pose and in terms of the trust that

12    the Court can place in them while this case is pending.

13          So we would ask Your Honor to enter a permanent

14    order of detention here.

15          MR. CONWAY:  Your Honor, two quick things.

16          THE COURT:  Go ahead.

17          MR. CONWAY:  In terms of the danger here, it's

18    clear that they joined Smookler and Russo at the hip.  And

19    if you read Pages 23 and 20 -- or 22 and 23, as I quoted

20    before, there's more quotes from Smookler in there than

21    there are from Russo.

22          In addition on Page 30, they wrote in the

23    detention mentions -- or the detention memo that they found

24    Smookler to be a greater risk of flight than any other

25    defendant in here.  Yet they, for whatever reason, decided

Proceedings                                    19

1   to consent to the same bail package that I am putting up

2   now.  I feel that it's --

3              THE COURT:  No, I appreciate that, Mr. Conway.

4              I am focused more, frankly, on the dangers to the

5   community angle of this situation.

6              You know, Mr. Conway, if someone is found in a car

7   with a gun under the seat and there are four people in the

8   car, the Second Circuit has told me in circumstances like

9   that that you attribute the availability of the gun when

10  determining bail, among other issues, to everybody in the

11  car because it's within reach.  In this case, I'm looking at

12  a very dangerous weapon, and I'm looking at an individual

13  who has allegedly been recorded as saying that, "I have a

14  tactical shotgun.  If anything gets crazy with you guys,

15  just come straight here.  I have all the lights on, I will

16  tactically shoot everybody's kneecaps off.  I'm not

17  worried."

18             And then we also have this discussion about

19  yanking the teeth out of someone's son's mouth.  You know, I

20  have handled organized crime cases for 20 years.  I've never

21  run across that kind of a threat --

22             THE DEFENDANT:  Your Honor, may I explain one

23  thing --

24             THE COURT:  -- in 20 years -- excuse me.  I'm not

25  done.

Proceedings                                    20

1        THE DEFENDANT:  I'm sorry, Your Honor.

2        THE COURT:  I'll give you a chance, don't worry.

3        THE DEFENDANT:  I'm sorry, Your Honor.

4        THE COURT:  That's something new to me.  And it's

5   very troubling that we have someone here who is allegedly in

6   possession of a tactical weapon.

7        And your comment -- the one comment that I paid

8   particular sensitivity to is the idea that Mr. Alfieri, you

9   know, had cheated these Defendants, when the allegations

10  here are that the funds that he allegedly cheated these

11  Defendants out of, they're not their funds, but they were

12  funds that were entrusted to one or more of them.  So we're

13  seeing that the Government's position is not that Alfieri

14  cheated them, but that Mr. Alfieri cheated somebody else

15  whose money was inappropriately invested with Mr. Alfieri.

16  So it's a distinction which I think makes some difference

17  here.  People get the idea that, you know, if they got the

18  cash in their hand, it's theirs, even if it's entrusted to

19  them as a fiduciary for investment purposes.  So these are

20  distinctions that bear on my consideration.

21       And I wanted you to understand that I deem anyone

22  who's got a tactical shotgun with a laser under his bed,

23  found under his bed or in his bedroom or in his house that

24  makes threats that refer to -- or is accused of having made

25  threats which refer to such a weapon, that that's an

Proceedings                                    21

1    extremely concerning issue, and that the Court can't view

2    that as just hyperbole or that you say around the bar with

3    your friends.  I mean, these are comments that are made in

4    the context of what is alleged to be a serious conspiracy on

5    the part of Mr. Russo, Smookler, and others.

6              So I just raised those issues, and I wish you

7    would address them so I get a full record.

8              MR. CONWAY:  Yes, I appreciate that, Your Honor.

9              And I totally can't disagree with the Court.  It

10   is concerning, and obviously something for the Court to

11   think about.  But putting it in context, Your Honor, while

12   the excerpts in the detention memo read about a call made by

13   others to Alfieri, the underlying issue here, Judge, is that

14   there was a series of contracts that Mr. Russo --

15             (Pause in proceedings.)

16             THE COURT:  Yes, thank you.

17             Everyone who is not speaking should place their

18   phone on mute at this time.  Thank you very much.

19             MR. CONWAY:  Okay.  We good?

20             THE COURT:  Go ahead.

21             MR. CONWAY:  Okay.  Thank you.

22             What I was trying to do, Judge, is to put this in

23   context.  While the detention memo does reference a loan

24   made by others, the underlying issue here is there was a

25   series of business transactions between Alfieri and the

Proceedings                                22

1    defendants in this case.  There were 14 different contracts

2    where they'd lent money to Mr. Alfieri, all written, all

3    signed, all agreements in the context of Mr. Alfieri

4    presumably being in the jewelry business.  It was only later

5    on that they learned that Mr. Alfieri was nothing more than

6    running a Ponzi scam for which he's been indicted for.  We

7    have filed -- our clients have filed notices of claims in

8    the bankruptcy court.  So the underlying issue here boils

9    down to that.  And then you get this loan, and basically

10   what you have, Judge, is you have somebody who has lost a

11   tremendous amount of money, realizes that it's probably

12   never coming back just blowing off a lot of steam.  It's

13   crystal clear that the comments are ugly and they're -- and

14   they're certainly colorful and certainly should have never

15   been said.  But I think it's also clear, Judge, that this is

16   something that were idle threats.  These are things that

17   happened over the phone.  They happened over a period of

18   time.  They never took any action on it, and for whatever

19   reason after May 20th they stopped.  We're here now on

20   August 19th, which is just about three months later, and

21   despite what I believe is wiretaps going on almost up to the

22   indictment, there were no other calls post-May 20th because

23   they realized that they're spinning their wheels.  They were

24   never going to act on these complaints.

25            Frank Russo is a businessman.  He's married with

1   two children.  He's not a killer.  He's not a shooter.

2   These were people blowing off steam.  Yeah, do they make

3   colorful and ugly comments?  They do, Judge.  But they were

4   never going to be acted upon.

5          The bail application that was set by

6   Magistrate Bloom do not render him a danger to anybody.

7   He's going to be electronically monitored in his house

8   without the ability to leave, unless it's accepted by

9   the Court.  His weapon was taken.  You know, I don't see him

10  as a danger to anybody.  And, you know, even the Government

11  themselves are saying he's not much of a risk of flight.

12         Given the pandemic we're in, given the nature of

13  the documents in this case and him not being able to be a

14  participant in his own defense when the Government agreed to

15  the other three individuals, to me, Judge, I just believe

16  the bail package is more than sufficient to allow him out at

17  this point.

18         THE COURT:  Yeah.  Let me point a couple of other

19  things out.

20         You know, I didn't see it in the papers, but the

21  situation with the defendant not having disclosed several

22  major assets raises, in my mind, and I don't know if all of

23  that was in front of Judge Bloom, that she knew about that,

24  but whether or not he did --

25         MS. GERDES:  We did not discuss that.

Proceedings                                    24

1          THE COURT:  Well, here's my problem about flight:

2    Once those assets are liquidated, like the house in Florida

3    and his holding a sum of money that would permit him to

4    leave the country, for instance, that would not only create

5    an impact to the litigation here, but it would also

6    potentially have a detrimental effect on his suretors,

7    because if he left, they would be left holding the bag on a

8    $2-million or $3-million bond, and he would be off wherever

9    he was going and perhaps in a place where he couldn't be

10   brought back.  Or if he used the money for some other

11   purpose, Pretrial wouldn't know, the Court wouldn't know,

12   you wouldn't know, the Government wouldn't know.  That's a

13   demonstration to me that he cannot be trusted to fulfill his

14   obligations to the Court if he is released.  And so there's

15   also that issue.  And I don't plan to rule on the issue of

16   flight, but it raises a -- it puts us in a place where I

17   have to be concerned for the people who would entrust their

18   financial future in his probity.  All right?  And now you've

19   got two more people who have not gone before the magistrate

20   judge, and they would have to also go through the process,

21   which is what we would do in that situation.

22          MR. CONWAY:  Yes.

23          THE COURT:  So this is -- there's more going on

24   here than just the question of the gun under the bed.

25          MR. CONWAY:  Yes, Judge.

Proceedings                                      25

1          THE COURT:  There's the fact that he's behaving in

2    a potentially misleading or dishonest way with the Court.

3          Now, you pose it -- you spin it one way and the

4    Government spins it another way, and I'm not in his head --

5          MR. CONWAY:  Right.

6          THE COURT:  -- but if you've got that many assets

7    and you're a middle-class person, which is what he appears

8    to be, you know what you have.  I can sit here and I can

9    list all of my substantial assets if someone asks me and I'm

10   obligated to tell them what they are.  It's not like he

11   overlooked it.  He owns a house with a trust, or whatever it

12   is, funds that came from somewhere.  He's got a house in

13   Florida that he's selling and is about to close on.  You

14   know, this is not -- this is not, you know, peanuts.  It's

15   not like he has a $20 gold piece from 1920 in his bureau

16   drawer.  So that's really what my concern is with regard to

17   your client in part.

18         MR. CONWAY:  If I could, Judge --

19         THE COURT:  So I just wanted to put that out

20   there.

21         MR. CONWAY:  -- just to put that in context.  He

22   did mention the whole -- to Pretrial that he did -- you

23   know, he did say that it was his wife's home.  It's in a

24   trust for her, so be that as it may.  But that home, Judge,

25   and the Florida home are already liened up by the

Proceedings                                        26

1   Government.  He's not getting any proceeds from either one

2   of those properties.  The Government has, pursuant to

3   forfeiture, put a lien on them, so he's not getting any

4   assets.  So in terms of using those assets to flee, they're

5   certainly not available to him.

6             THE COURT:  I see.

7             MR. CONWAY:  The people that are putting up bail

8   are the people that know him the best.  It's his wife, it's

9   his mother, it's his brother, it's his mother-in-law, and a

10  friend that he's known for 25 or 26 years.

11            And, you know, Judge, you never can get into

12  somebody's mind, although I guess we often wish we could,

13  but, you know, you talk about sitting down for a Pretrial

14  report interview, here's somebody who is arrested at

15  6:00 o'clock in the morning, transported downtown, and the

16  next thing you know he's talking to somebody about his

17  assets.  He's not thinking rationally at the time.  I don't

18  think there was any attempt by Frank Russo here to hide

19  assets.  He was sitting there bewildered as to what was

20  going on and he gave whatever information he could at the

21  time.

22            You know, we'll be happy to give a full listing of

23  all assets at this point so the Government can see them and

24  do what they need to do.  But he's certainly not going to go

25  anywhere.  He's certainly not going to harm his family and

Proceedings                    27

1   friends.

2          And again, without belaboring the point, I think

3   the threats were colorful, were -- were nothing more than

4   puffery, and I think the conditions set by

5   Magistrate Judge Bloom and recommended by the

6   Pretrial Services are far and enough to render him not a

7   danger to anybody.

8          THE COURT:  All right.  Anything else from you,

9   Ms. Gerdes?

10          MS. GERDES:  Your Honor, the only thing that I

11   would add is that I just can't accept that representation

12   that, you know, Mr. Russo is somebody who would -- you know,

13   a deer caught in the headlights and didn't understand what

14   was happened with Pretrial.  We've listened to him for the

15   last 90 days, Judge, and so --

16          MR. CONWAY:  That's not what I said, Judge.

17          THE COURT:  Okay.

18          MS. GERDES:  I'm sorry.  That's how I interpreted

19   the comment, and so I'm just trying to respond to that.

20          THE COURT:  I'm sorry.  Mr. Conway, if you want to

21   say something else, I am open to having you speak.  Just let

22   Ms. Gerdes finish her statement, please.

23          MR. CONWAY:  Thank you.  Thank you.

24          THE COURT:  Go ahead.

25          MS. GERDES:  So from the Government's perspective

Proceedings                                           28

1    we have gotten the smallest window into the life of Frank

2    Russo by listening to him for a 90-day period, and in that

3    period the man has talked extensively, extensively about

4    hiding his assets; about created entities; putting assets in

5    other entities so that the Government cannot track them;

6    about, you know, liquidating assets that he could -- we had

7    no idea that we would stumble upon these, about $80,000 in

8    his house; and he is somebody who is just absolutely

9    deceptive and manipulative, and that's exactly what he did

10   with Pretrial Services, a branch of the Court, when he had

11   his first chance of interacting with somebody who was, you

12   know, going to make a recommendation to the Court if he was

13   somebody who should be trusted.  And, you know, when

14   Defense Counsel gets the wiretap evidence, I do not think

15   that that is something that they are going to be in any

16   position to dispute.

17          But I will proffer to the Court that this is a

18   defendant who has taken great steps to try to --

19          THE DEFENDANT:  (Inaudible response.)

20          MS. GERDES:  I'm sorry.

21          -- to try and hide and conceal his assets from

22   the Court.  And, again, he's not somebody who can be

23   trusted, Your Honor.

24          THE DEFENDANT:  (Inaudible response.)

25          (Pause in proceedings.)

Proceedings                                29

1      THE COURTROOM DEPUTY:  Is everybody still there?

2      ALL PARTICIPANTS:  Yes.

3      THE COURT:  All right.  Anything else, Mr. Conway?

4      MR. CONWAY:  No, Your Honor.  I'm not going to

5  belabor the point.  I just, you know, as I said before, I

6  don't see a distinction between Smookler and Russo.  And,

7  you know, without going through my whole other arguments

8  before, we'll be as transparent as we need to be with

9  anybody.  As the Government just said, there are months and

10  months of wiretaps.  This is going to be a complex case.

11  It's going to be almost nearly impossible for him to have

12  any meaningful participation in that defense if he's in the

13  Metropolitan Detention Center during a pandemic.  So I would

14  ask, even if the bail package is not enough, that a certain

15  bail package be set to give us an opportunity to make that.

16  Although I do believe the one that we are proposing is more

17  than adequate.

18      (Pause in proceedings.)

19      THE COURTROOM DEPUTY:  Hello?  Is everybody there?

20      THE COURT:  Yes, we're still going.

21      (Pause in proceedings.)

22      THE DEFENDANT:  Your Honor, can I have a second?

23      THE COURT:  Sure.

24      THE DEFENDANT:  While I can't come up with

25  anything, so I'm just going to come up with --

1              THE COURT:  Hold on.  No, no, no.  I didn't know

2       who said has asked that.

3              THE DEFENDANT:  Okay.  Fine.

4              THE COURT:  No, please don't say anything.

5              THE DEFENDANT:  All right.

6              THE COURT:  I appreciate you would like to say

7       something --

8              THE DEFENDANT:  Okay.  All right.

9              THE COURT:  -- but I need to protect your right to

10      remain silent and not create a larger record than is already

11      out there.  So, please, whatever you do, don't say anything,

12      except to your lawyer.  All right?

13             All right.  Thank you very much.

14             I think this is a hard decision to make.  I'm

15      concerned about two considerations -- or more than two,

16      actually.  The statements that the defendant made to others,

17      which are in the nature of threats, I do not view those as

18      bravado.  The Court views those as serious threats that were

19      made or recorded by the Government using wiretaps, and they

20      referred to -- at least some of them on Page 31 of the

21      detention memorandum, rather, of the Government, referred to

22      the use of a tactical shotgun which was found in the

23      defendant's home and the fact that this is a white-collar

24      crime that's alleged -- or white-collar crimes that are

25      alleged, the fact that this kind of factual circumstance is

Proceedings                                    31

1    more attuned or consistent with a case involving extortion

2    and threats of great physical harm.  And even though this

3    defendant doesn't have a criminal history, the fact is that

4    people are capable of doing great injury to others who have

5    never done so before because they feel cornered or they feel

6    that their family is going to be injured or whatever it is

7    that they're doing.  But these comments demonstrate, along

8    with the seized weapon and ammunition, demonstrate that the

9    defendant has demonstrated that he constitutes a threat to

10   the community and that is my great concern here.

11          So the Bail Reform Act directs the Court to order

12   a defendant detained pending trial where no condition or

13   combination of conditions would reasonably assure the

14   appearance of the person as required and where the safety of

15   any other person in the community is involved, and

16   dangerousness must be supported by clear and convincing

17   evidence.

18          I don't know how to address the problem with

19   Mr. Smookler because that's not before me.  But I believe

20   that there is more than adequate evidence in this record

21   that supports by clear and convincing evidence that the

22   defendant constitutes the level of dangerousness sufficient

23   to hold the defendant in custody; and therefore, I'm going

24   to set aside the decision of Judge Bloom and enter a

25   permanent order of detention.

                         Proceedings                    32

1              Is there anything else?

2              THE DEFENDANT:  May I say something, Your Honor?

3              MS. GERDES:  No, nothing from the Government.

4    Thank you.

5              THE COURT:  All right.  Thank you.

6              MR. CONWAY:  Nothing for the defendant.

7              THE COURT:  All right.  Thank you everyone.  Have

8    a good day.

9              (Matter concluded.)

10                         --oo0oo--

11

12

13

14

15

16    *I (we) certify that the foregoing is a correct transcript*
      *from the record of proceedings in the above-entitled matter.*
17
          */s/ David R. Roy*            *22nd Day of August, 2020*
18           *DAVID R. ROY*                      *Date*

19

20

21

22

23

24

25